SAFETY CAR HEATING & LIGHTING CO. v. CONSOLIDATED CAR
HEATING CO.

(Circuit Court, N. D. New York. March 26, 1908.)

No. 6,986.

1. PATENTS—INVENTION—CAR HEATING APPARATUS.
    The Searle patent, No. 707,361, for a railway car heating apparatus,.
the essential feature of which embodied in the third claim is "in combi-
nation a water circulating system having a radiating portion in the de-
scending pipe or upon one side thereof, and a second heater located be-
low the first-named heater and at substantially the lowest point of the
circuit," is void for lack of invention in view of the prior art, the loca-
tion of a heater at the lowest point of the circuit being old, and the use
of two heaters at different points being a mere aggregation of old parts.
which act independently and simultaneously without having any effect
on each other or producing a new result.

2. SAME—CONSTRUCTION OF CLAIMS—INFRINGEMENT.
    Where an applicant for a patent contesting with others, and after re-
peated rejections in order to. obtain a patent at all bases his claim there-
to on a "peculiar organization" of parts, and specifies and specifically
names and locates those several parts, he is held to the peculiar organi-
zation so particularized, specified, and claimed.
    [Ed. Note.—For cases in point, see Cent. Dig. vol. 38, Patents, § 253.]

**3. SAME—CAR HEATING APPARATUS.**

The Dixon patent, No. 457,706, for a car heating apparatus, as limited by the prior art and the proceedings in the Patent Office, *held* not infringed.

**4. SAME—SUIT FOR INFRINGEMENT—LACHES.**

A suit for infringement of a patent is barred by laches where the defendant, a rival manufacturer, commenced making, advertising, and selling substantially the same device as that alleged to infringe more than 10 years before the suit was brought and before the patent was issued, and continued the same up to the time of suit.

[Ed. Note.—Laches as a defense in suits for infringement, see notes to Taylor v. Sawyer Spindle Co., 22 C. C. A. 211; Richardson v. D. M. Osborne & Co., 36 C. C. A. 613.]

In Equity. Suit to restrain alleged infringement of United States letters patent to complainant, as assignee of R. M. Dixon, for car heating apparatus, No. 457,706, dated August 11, 1891, applied for November 26, 1888, and United States letters patent to John Q. C. Searle, Julia E. Searle, executrix, etc., for railway car heating apparatus, No. 707,361, dated August 19, 1902, and applied for March 23, 1888, renewed August 26, 1898, and for an accounting.

Betts, Sheffield & Betts (Edmund Wetmore, Samuel R. Betts, Randolph Parmly, and John W. Peters, of counsel), for complainant.

Richardson, Herrick & Neave (W. K. Richardson, Charles Neave, and J. Lewis Stackpole, of counsel), for defendant.

RAY, District Judge. This suit originally alleged infringement of the patent to William C. Baker, No. 411,915, as well as those to Dixon, assignor to complainant, No. 457,706, and to Julia E. Searle, executrix of John Q. C. Searle, No. 707,361, but during the taking of complainant's rebuttal testimony the Baker patent was withdrawn from the controversy and will not be considered, except perhaps as a part of the art to which the patents now in suit relate. Both of these patents were applied for some years before they were issued; the Dixon patent November 26, 1888, and the Searle patent March 23, 1888. The Dixon patent issued August 11, 1891, and the Searle patent August 19, 1902, some fourteen years after application filed. Both patents relate to apparatus for heating railway cars, hot water circulating systems, and all the claims are in issue here. The record is voluminous, especially in exhibits and drawings. These patents show and describe the use of steam taken from a source of supply for the purpose of heating the hot water circulating system. The Searle patent is not confined to steam heaters, but as the defendant's device, alleged to be an infringement, involves the use of steam heaters, the Searle patent may be referred to as though confined to steam heaters for heating its circulating system.

The defendant corporation was organized in 1889, as a consolidation of the McElroy Car Heating Company and the Sewall Safety Car Heating Company. The defendant says that it commenced the manufacture and sale of the alleged infringing apparatus, or similar apparatus, in 1890, and has continued so to do undisturbed by complainant down to the time suit was brought in 1903, a period of some

12 years as to the Dixon patent. It was also making and selling substantially the same system now complained of during nearly all the time the Searle application was pending in the Patent Office. The defendant denies infringement, and pleads laches as to the Dixon patent, and alleges that the Searle patent is invalid, disclosing no patentable invention in view of the prior art. The William C. Baker patent, No. 411,915, applied for December 10, 1888, was issued October 1, 1889, and is for heating apparatus for railway cars. Also, No. 473,721, dated April 26, 1892, applied for June 24, 1887.

Hot water circulating systems for heating cars were not new in the art when the patents in suit were applied for—thus, Pike, No. 124,-973, dated March 26, 1872; Weibel, No. 144,425, dated November 11, 1873, applied for August 23, 1873; Baker, No. 75,345, dated March 10, 1868; Duffield, No. 194,418, dated August 21, 1877, application filed February 5, 1877; but many patents were applied for at near the same time—thus, Towne, No. 397,152, dated February 5, 1889, applied for June 13, 1887; Dolan, No. 506,984, dated October 17, 1893, applied for October 5, 1887; Shinn, No. 484,343, dated October 11, 1892, applied for September 2, 1887; Gold, No. 388,772, dated August 28, 1888, applied for August 25, 1887; Towne, No. 512,239, dated January 2, 1894, applied for February 4, 1887; Magee, No. 584,288, dated June 8, 1897, applied for December 15, 1887; Baker, No. 590,470, dated September 21, 1897, applied for April 11, 1887. Others might be mentioned. This heating of the prior art was not confined to heaters in the car itself, but included steam taken from the engine. In letters patent to Charles F. Pike of Providence, R. I., dated March 26, 1872, No. 124,973, for "Improvement in Railroad-Car Heaters," he says that he has invented, and then goes on to describe, his new and useful "apparatus for heating cars." He says:

"And it consists in passing the exhaust steam from the locomotive-engine through suitable pipes, first through the feed-water in the tender and then successively to heaters under the cars from whence the heat is distributed to pipes and registers in the cars," etc.

He carries the steam in pipes through the feed water in the tank of the tender and heats it, thence through pipes to the heaters under each car. The heaters are inclosed in a nonconducting case and contain a number of small tubes through which the steam passes heating the oil or other noncongealable fluid in the heaters, or these tubes may be filled with oil and the steam pass around them. Pipes run under the upper floor of the car, there being a double floor provided. A branch pipe from each heater leads the heated fluid into these pipes which are connected. He says:

"The heated liquid passing up one side and returning passes through the pipes into the bottom of the heater to be there again heated, and so on automatically, keeping up a constant circulation."

He also provides registers. He says:

"In the bottom of the heaters are arranged small cocks for letting out the condensed water. The pipes are all connected by flexible, universal, or slip-joints of the usual kind. The great advantages of my invention are, first, perfect safety, there being but one fire on a train, viz., in the furnace of the

locomotive, and of course no accidents can occur from upsetting of stoves, and thereby the liability of being burnt to death is avoided. An equal temperature can be maintained in the whole car, and not, as now, with stoves, the passengers near the stove obtaining all the benefit therefrom and those in the center none; second, saving of fuel in the stoves."

His apparatus and circulating system was not confined to the use of exhaust steam, for he says:

"When it is desired to heat the cars before starting the virgin steam may be run through the pipes and heaters until the train is in motion, when the exhaust steam may be used," which, etc.

He then claims his arrangement of pipes, heaters, etc., as shown, and also:

"2. The method herein described for warming and ventilating railroad cars, consisting in passing steam (waste or virgin) through pipes in contact with a system of coils or pipes inclosed in air-flues, boxes, or chambers so that the steam heats the liquid in said coils or pipes, and the liquid by automatic circulation heats the air, so as to warm and ventilate the cars, substantially as set forth."

His heaters are arranged and located at the lowest point in the system, and it is perfectly apparent from his patent that he fully appreciated the benefits flowing from such an arrangement. This system of Pike suggested plainly and emphatically every advantage of a hot water circulating system in railroad cars, and long in advance of the fire horrors of 1887 on railroad trains he suggested the necessity of it, with steam heaters under each car supplied with steam from the engine of the train. He left nothing for succeeding inventors in this field except the perfecting of the circulating system. Now, in 1868, Baker had given to the world his patent for "Improvement in Railroad-Car Heaters," No. 75,345, in which he had a circulating hot water apparatus, the heater being a fuel-fed stove standing on the floor of the car. He points out the necessity of having the heater lower down than the circulating pipes—that is, of putting it at the lowest point in the system—but as he could not so locate a stove on a railroad car he provides a remedy so far as he can. He says:

"My invention relates to a circulating hot-water apparatus, especially adapted to railroad cars and other vehicles, in which the radiating or heating pipes are necessarily placed near the level of or below the fire. In hot-water warming apparatus, the heating-pipes have usually been elevated above the fire, so as to obtain an upward and distant circulation, and a downward return to the heater. Such apparatus has not been adapted to heating railroad cars, because the heat would not be sufficiently near the floor. The nature of my said invention consists in a circulating water apparatus, in which the heat is applied to a tube that extends upward to a water and expansion vessel, and from this water-vessel the circulation is downward, and through the radiating or heating tubes, and returns to the heater. * * * The pipes of my coil can therefore be led in any desired direction within the car or vehicle, and the stove or heater may be located wherever convenient. The ascending hot-water pipe can be carried up sufficiently high to insure the proper circulation through all the pipes connected with it, without depending upon the relative position of the heater to the coil for effecting the circulation, as heretofore."

The idea of auxiliary heaters and steam-generators—that is, more than one—along a line of piping to aid the circulation and keep up

heat was not new, and is fully described in patent to Baker, No. 247,529, dated September 27, 1881. When in 1887 and 1888 there came a general demand for the adoption and use of a system for heating railroad cars which should exclude stoves and heaters burning combustibles from the cars, and dozens of applications for patents for various suggested devices were filed in the Patent Office, it was not a new or novel thought or conception that stoves and heaters burning combustibles might be done away with in railroad cars, and that the necessary heat might be supplied from the engine of the train in the form of live steam and applied to the heating of water, oil, or other fluid, at the car, which in turn should circulate through pipes and radiators suitably located in the car as in hot water circulating systems elsewhere. There was no great difficulty in bringing live steam from the engine to the cars; there was no particular difficulty in heating water in a coil of pipe by means of this hot steam; there was no great difficulty in circulating the water when made hot through lines and coils of pipe and radiators. It was old in the art to do all this. The questions were what is the best method, the least expensive. Those who remember anything at all on the subject recollect that the cry of the railroad was, not that it could not be done, but that it was a too expensive thing to do. Little effort had been made to improve or perfect the Pike idea, for the Baker idea had been regarded as the best thing the railroads ought to be called upon to put in practical operation. The record in the case shows what many remember—that within a very short time successful and quite satisfactory results in hot water heaters were obtained—and the legislation of the state of New York abolished the use of stoves in railroad cars.

The combination of the Dixon patent is of (1) a system of circulating pipes; (2) an expansion reservoir connected with the pipes; (3) a main source of heating supply in operative connection with said system of pipes at different points by means of; (4) a series of transfer drums, one placed above and the other below the main body of said pipes; (5) branch steam pipes leading from the main steam pipe through the upper transfer drum and into the lower transfer drum; (6) a cock for controlling the admission of steam into the drums, and a cock in the lower drum for discharging the water of condensation.

The Searle patent, in claim 1 has in combination (1) a circulatory system which includes (2) a heat radiating portion (3) having an ascending pipe on one side thereof, and (4) a descending pipe on the other side thereof, (5) a heater in the ascending pipe, or upon one side thereof, and a second heater located below the first-named heater, and at substantially the lowest point of the circuit. Claim 2 is like claim 1, but adds an "expansion chamber" located above the ascending and descending pipes, substitutes "emergency heater having a combustion chamber" for "heater" in the ascending pipe, "primary heater" for "heater" at the lowest point of the circuit, and adds "means for transferring heat derived from the main source of heat supply into operative contact with the circulating liquid in this primary heater. Claim 3 places the "heat radiating portion" in the descending pipe or on one side thereof, a heater in the ascending pipe, or upon the other side thereof, and a second heater below the first-named heater, and at

substantially the lowest point of this circuit. The claims of these patents are not lengthy, and will be inserted:

### Dixon Claim.

"In a heating apparatus, the combination of a system of circulating-pipes connected with an expansion reservoir, a main source of heat-supply in operative connection with said system at different points by means of a series of transfer-drums, one placed above and another below the main body of the circulating-pipes, branch steam-pipes, H and H', leading from the main steam-pipe, B, through the transfer-drum, G, and into the transfer-drum, F, a cock, f, for controlling the admission of the steam into the drums, and a cock, h, in the drum, F, for discharging the water of condensation, substantially as set forth."

### Searle Claim.

"1. The combination, of a circulatory system that includes a heat-radiating portion and has an ascending pipe on one side thereof and a descending pipe on the other side thereof, a heater in the ascending pipe or upon one side thereof, and a second heater located below the first-named heater, and at substantially the lowest point of the circuit.

"2. The combination, of a circulatory system that includes a heat-radiating portion and has an ascending pipe on one side thereof, a descending pipe on the other side thereof, and an expansion-chamber located above said pipes and having communication therewith, an emergency heater having a combustion-chamber inclosing a portion of the ascending pipe of said system, a primary heater located at substantially the lowest point of the circuit, and means for transferring heat derived from a main source of heat-supply into operative contact with the circulating liquid in said last-named heater.

"3. In combination, a water-circulating system having a radiating portion in the descending pipe or upon one side thereof, a heater in the ascending pipe or upon the other side thereof, and a second heater located below the first-named heater, and at substantially the lowest point of the circuit."

An "expansion tank," in this connection, is a vessel to maintain a reserve supply of water in constant communication with both branches of the circulating system, and it should have a safety valve and means for filling the system with water. "Transfer heaters" are mere jackets surrounding a portion of the piping carrying the water and these are supplied with steam sufficiently hot to heat the water in the pipes contained therein. This steam may come from the boiler of the engine or any other suitable source. Of course it is understood that water in a jacket or cylinder could be heated by the steam contained in coils of pipe passing through it, and then be carried into the water pipes of the circulating system. In this case the heat of the steam in the jacket is transferred to the water in the pipe of the ascending branch, and, in accordance with the operation of very old and well-known laws, this heated water then rises and the colder and consequently the heavier water in the descending branch takes its place and in its turn is heated and hence a constant circulation is maintained so long as the heat is applied. This is conceded by the complainant's expert Morse. It has been well known for centuries that the tendency of hot water in a pipe is to rise while the cold will sink, and this fact was recognized in the prior art by Baker in 1868, when in his patent, No. 75,-345, he applied a hot water circulating system to the heating of cars. It was obvious that as hot water rises it would tend to push what was above it, and, as the tendency of the colder water was to sink and take its place, that the nearer the bottom of the circulating system the

heater was located the better. It was also recognized that while both an up and a down current might be maintained in a single pipe still an adequate and operative system required two branches or lines of pipe from the heater, the one leading from it and called the ascending. branch and the other, connected of course, called the descending branch, leading back to the heater, so as to allow the colder water in the circuit to renew its heat. It was also perfectly obvious that this water in the system traveling long distances through its turnings would give off and loose its heat rapidly, it being sent through the circuit for that very purpose, and that, in traveling a long road through a car, where the water pipes were mainly on a horizontal line, it would be advisable and even necessary to do something to accelerate the circulation and renew the heat at some point in the circuit. All this was old, as we have seen, and it was especially true where in a long train of cars the common and primary source of heat for all the cars was the boiler of the engine. As we have seen, in 1868 and in 1872, this was recognized. It was also recognized that, in such a system, where two heaters were used, the one should be placed above and the other below the main circulating pipes but both in the ascending pipe. It would have been idiotic to place a second heater in the descending pipe as that would have retarded circulation; that is, the two would have opposed each other so far as circulation was concerned. There was nothing new or novel in the idea of placing one of these heaters at substantially the lowest point of the circuit and the file wrapper of the Searle patent in suit demonstrates that Searle had no thought that there was any novelty in the idea or patentable novelty in an apparatus for hot water heating in railway cars which located one heater, when two were used in the system, at substantially the lowest point of the circuit.

The file wrapper of the Searle patent in suit shows that his application filed March 23, 1888, contained 17 claims and extensive specifications, all of which disappeared. They contained no reference to a heater "at substantially the lowest point of the circuit." In the specifications we find:

"The water heating chamber, 6, Figs. 1, 2, and 3, or, heating chamber, 6', Figs. 2, 3, and 7, located below the car, may form part of a single flow system, and may be arranged so the water before passing to the pipes that heat the car, may be heated by means of steam brought in contact with the circulating water in either of the ways heretofore described. * * * As shown in Figs. 2 and 3, a detachable and removable water heating chamber, 6', may be located beneath the car, and contain a steam coil, 5, which has been described with reference to other figures of the drawings."

In the claims we find:

"3. In a hot water warming apparatus for railway cars, the combination of a heater, water dividing chamber or fitting located above the heater, circulating pipes that heat the car and discharge into a combined water uniting, and water heating chamber below the car and connected to the heater substantially as described.

"4. In a hot water warming apparatus for railway cars, the combination of a water heating and circulating passage connected to a water dividing and expansion chamber above it, in which the water is divided, into two separate flows and relieved of the bubbles of steam and air, and a water uniting

chamber or fitting below the heating pipes to collect the separate flows and return them to the heater substantially as described. * * *

"7. In combination with the stove, I, a water heating and circulating chamber, 6', located below the car floor communicating with the lower leg of coil 8, and with the pipes that heat the car, said chamber enclosing a steam coil connected to a main steam supply, and arranged so the water can be heated with fire in the stove, or, by steam forced through the coil in contact with the circulating water, or, by both at the same time substantially as described. * * *

"10. In a hot water warming apparatus for railway cars, the combination of a heater, hot water circulating pipes, a detachable and removable water circulating passage or chamber located below the pipes that heat the car, inclosing a steam coil and communicating with a water passage or chamber above the heater through which the hot water must pass to heat the car, substantially as described."

May 15, 1888, Benton J. Hall, Commissioner of Patents, in a communication to Searle inclosed a summary of the claims, and there is no suggestion of a claim for a heater in the system so located. June 2, 1888, the Commissioner communicated to Searle a statement of the subject-matter of an interference, and said:

"The subject-matter involved in the interference is (1) the combination with a car, of a system of circulating pipes within said car and two heaters both in operative contact with said circulating system or with branches thereof and adapted to be operated simultaneously or separately for imparting heat thereto; (2) in a car heating system the combination with a system of water circulating pipes within the car of a suitable radiator in contact with said circulating system, or a branch thereof, mechanism for supplying said radiator with steam as a primary means of heating said circulating system, and a secondary heater also in operative contact with said circulating system and adapted to heat the same."

October 28, 1890, C. E. Mitchell, then Commissioner of Patents, communicated to Searle a further interference in which he said:

"In combination, a water circulating system having a radiating portion in the descending pipe or upon one side thereof, a heater in the ascending pipe or upon the other side thereof, and a second heater located below the first-named heater, and at substantially the lowest point of the circuit."

This was the language of Steward, examiner, not of the patent, and related to the location of the lowest heater.

April 22, 1892, about 4 years after the first application was filed and about 18 months after receiving this suggestive communication from the Commissioner, Mr. Norris, then attorney for Searle, wrote:

"Add to the above-entitled application the following additional claims to those already in the application. * * * In combination, a water circulating system having a radiating portion in the descending pipe or upon one side thereof, a heater in the ascending pipe, or upon the other side thereof, and a second heater located below the first-named heater, and at substantially the lowest point of the circuit."

As between Benjamin and Searle it was decided that two heaters in the ascending pipe of the system, one above and one below as mentioned in the claims first filed, was the invention of Searle, but there is nothing to show that Benjamin ever claimed the lower heater as located at substantially the lowest point of the system. It is evident that idea was the suggestion of the Patent Office and not a conception of Searle.

July 6, 1892, W. E. Simonds then Commissioner of Patents directed a revision and restriction of the claims. May 19, 1894, another interference was declared, and as a result, it seems, June 17, 1895, Searle canceled his claims and specifications and substituted others, increasing his claims to 27, and filing affidavits to carry the date of Searle's reduction to practice of his invention back to April, 1887. He also filed new specifications and drawings. All of these claims were rejected August 13, 1895. In the new specifications, Searle said:

"It will therefore be seen that my invention contemplates the use of at least two heaters arranged at different elevations in the system and which may be of any suitable construction or character, deriving their heat from any suitable source, or else a heater located below the line of the circulating system and at substantially the lowest point of the circuit."

It is evident that he did not know, even then, in view of the attitude of the Patent Office, whether to claim two heaters "arranged at different elevations" or one located "below the line of the circulating system." He was willing to accept either, and was waiting to ascertain which might be deemed patentable. Among these 27 new claims we find the following:

"1. In a heating system for railway cars, the combination of a liquid-circulating system for the liquid to be heated, having a radiating portion and a heater for heating said system arranged below it at the lowest point of the circuit, substantially as set forth. * * *

"3. In combination, a water circulating system having a radiating portion in the descending pipe or upon one side thereof, a heater in the ascending pipe or upon the other side thereof, and a second heater located below the first named heater and at substantially the lowest point of the circuit, substantially as set forth."

In "Remarks," appended to these new claims, he says, "Claims 12 to 26, both inclusive, are verbatim copies of original claims," etc. Reference to the original claims demonstrates they are not. All of these new claims were rejected August 13, 1895; new claim 1 on Pike No. 124,973, and new claim 3 on patents to Towne, No. 512,239, taken with Pike, and the examiner said:

"Claim 1 is rejected on the patent to Pike, 124,973, March 26, 1872, 'Train Water Heating Systems, Steam.'

"Claims 2, 3, 4, and 5 are rejected in view of the patent to Towne, 512,239, Jan. 2, 1894, 'Train Water Heating Systems, Steam,' when taken with the patent to Pike, above cited. Towne shows all the elements set forth in these claims, and Pike shows it to be old to locate a steam heater at the lowest part of a water circulatory system. To locate Towne's steam heater at the lowest part of his circulatory system, in view of Pike, would not involve invention. * * *

"Claim 8 is rejected on the patents to Towne, Pike, and Searle, noted, the patents to Towne and Pike showing the arrangement of the parts claimed, and Searle showing it to be ordinary to duplicate steam heaters in operative contact with water circulatory system."

October 25, 1895, Searle, by his attorney, submitted numerous amendments and a long argument and complaint in which he said, amongst other things:

"The soul of this invention which the examiner designated in the interference as patentable consists in the particular arrangement of one heater with reference to the other. * * * The two patents of Towne and Pike

are irrelevant, especially in view of the fact that they are lacking in the very feature which constitutes the soul of the invention or combination, to wit, the arrangement of one heater below the other, and at substantially the lowest point of the circuit. * * * There is no advantage in using two heaters in the same system unless one of the heaters is located at a different elevation than the other and is so connected with such other that the force resulting from the ascendancy of the water in the first heater will create a circulation through the upper heater, or, which is the reverse of this, the ascendancy of the water in the upper heater will draw the current through the lower one."

Now it so happens that this very idea had been expressed and fully illustrated in British patent to Oswald Rose, No. 2,567 of May 31, 1882 (see Fig. 16), where we have the primary and lower heater and two auxiliary heaters in the line of circulation one above the other. The patentee says:

"Figure 16 shows an arrangement by which large spaces can be heated by one circulating pipe and the water therein maintained at a high temperature notwithstanding the length of piping it has to pass through. X is the main heater, and X' X2 are other heaters placed round the pipe at suitable intervals after the manner shown in Figure 3 to assist in maintaining the heat in and promoting the circulation of the water or other fluid contained in the endless pipe."

His system is applied to railway carriages. Rose used electricity instead of steam for communicating heat to the water in the circulating systems of pipes.

The Towne patent of 1894 covered a system of circulating pipes, two heaters in operative contact therewith, and operated separately or simultaneously, one designed to be the main source of heat and the other for emergencies or use when the other did not sufficiently heat the car, both heaters being in the circulating system, so that the one supplemented the one or aided the other in heating the water in the pipes. This stove or heater was also so constructed that, if by insufficiency of steam from the engine, or want of it when the car was detached from the train, it was desirable to add other heat to that of the steam, or heat solely by other means, the water in the pipes and entire system could be heated by a gas flame, etc. Towne said nothing of having the one heater higher up than the other. He describes, in part, his system as follows:

"A transfer-chamber in each car adapted to be connected with the prime heater and to receive heat therefrom through pipes and flexible couplings between the cars, and to transfer the heat thus received to the local circulating medium of the car; third, a local circulatory system of pipes in each car connected with the transfer chamber and adapted to have the water contained in said pipes heated by it; fourth, a local supplementary heater in each car connected with the transfer chamber and adapted to heat the local circulating medium by direct combustion of fuel. * * * Instead of having the local heater embody in one structure the steam heated transfer chamber and the combustion chamber, as just described, these two chambers may be either duplicated or divided."

It seems clear to me that it was a self-evident proposition that if one steam heater would heat the water at one point and cause it to rise that another in the same ascending pipe would add heat to the ascending column of water, or restore heat at a distance from the starting point, and, in either event, keep up or accelerate the circulation

as the case might be or necessity demand. All this was pointed out and illustrated in the prior art as we have seen. As heater after heater in this art had been placed at the lowest point in the circulating system as common sense and experience dictated it should be, for the reason that the effect of heat on the water in the pipe when the proper temperature was reached was to cause the heated water to rise and move onward, it seems to me that in 1887 the idea of placing one heater at substantially the lowest point in the system was no longer new or novel, and that the location of a heater at that point presented no patentable invention. To my mind it was no more patentable to place the primary heater at the base of the column of water than it would have been to locate the fire at the lowest end of the chimney, base of the column of air, if it had been desired to establish circulation throughout its entire length. The history of the art does not suggest that any one ever thought of patenting such an arrangement until it was suggested, not by Searle, but by the remark of the Examiner that such was the arrangement illustrated in the drawings of Searle. Out of the 17 original claims of Searle, neither of which suggested those finally allowed, and out of the 27 new claims, including those formulated and presented in 1892, three were finally allowed, 10 years later, after rejection, amendment, and changes, as the result of mere persistence, the 3 claims in suit. And it is conceded they present no possible element of novelty unless it be in the placing of one of the heaters "at substantially the lowest point of the circuit." And to make a possible patentable combination this must be done in connection with another heater at another point on the ascending column of water—that is, on the ascending pipe. To place one heater at the lowest point had been done before, several times; that it should be placed there for convenience to secure the best results were obvious and hence it became the old story of putting one stove by the side of another, but at a distance from it, to better heat the building. It has been known for generations that the best way to heat the rooms on the first floor is to put your heater there, or in the basement, and not in the attic, as heat rises—the same as hot water—and that, if you would add to the heat of the air that passes to the chambers above and becomes cooler, you should place another heater there. I do not think such an arrangement of heaters in 1887 would have presented patentable novelty.

Ordinarily the work of the one heater in the circulating system of Searle would be as complete and effective and produce as good a result as the work of the two. The second heater in the system (I am not referring to the emergency heater), the more elevated one, made hot by steam brought to it from the common source of supply, and transferring the heat to the water in the pipes, works precisely the same and produces precisely the same result it would were the other not in the system. Its function and its sole function is to heat the water in the pipe at that point, taking it as it finds it when it arrives. It neither aids nor retards the operation of the one below, the so-called primary heater. That heater's sole function is to heat the water at that point taking it as it finds it. When heated to a certain point the water rises in obedience to a natural law. This heater must

heat the water to a certain degree before it will expand and rise.   This water once made hot rises of its own accord and passes on, and the heater busies itself with a fresh supply.   Its power to heat the water is derived solely from the steam brought from the locomotive or other source of supply and depends thereon.   The second heater aids it in no way in transferring heat from the steam to the water.   It does not draw the water through it or to it or aid it to transfer more heat to the water that comes to it than it otherwise would, or impart heat to it more easily.   The first heater does cause hot or warm water to reach the second heater but this water being hot or warm in any degree does not aid the second heater to transfer to it more heat than it otherwise would, or to do its work of transferring the heat from the steam to the water more easily or expeditiously.   You can heat warm water to the boiling point, or any desired point more quickly than you can cold water for the reason it requires the transfer of less heat, but the work of transferring the heat that is transferred, which is the function of the heat itself, remains precisely the same.   Hence the placing of two heaters in the same ascending pipe is a mere aggregation.

This is not a patent or a claim for an improved heater or an improved transfer heater, but merely for a combination of old elements constituting a structure for heating cars, etc.   It is not a new or improved process for heating water in a circulating system or for transferring heat from a steam pipe or pipes or receptacle to water in such a system.   The process of reasoning by which the conclusion was reached that these claims disclose patentable invention was (and I quote from Steward, Examiner):

"As regards the merits of the invention, it is noted that in the declaration of interference No. 14,804, the issue in said interference was believed to be patentable over the issue in interference No. 12,961, only in the precise arrangement of the heaters, relative to the liquid circuit, the prime function of the heater in the ascending pipe being, in the opinion of the examiner, to give direction to the heat conveying medium, while the prime function of the 'second heater' was to heat said medium, the object of locating said 'second heater' at substantially the lowest point of the circuit being to cause the circulating medium to be in a heated state on entering the ascending pipe, thus avoiding the extra work of lifting said medium while in its cold-dense-state, which would result were the said second heater situated at any other point of the circuit.   Considered in this light, there is an interdependence in action between the two heaters, hence, the assemblage is something more than a mere duplication of parts or a mere aggregation."

It should be remembered that the water in this circulating system when the heat is first applied is all of the same temperature.   The steam from the locomotive reaches each heater by independent means at practically the same instant of time, and each heater commences its work of transferring heat from the steam to the water at substantially the same instant of time.   The action of the heat on and in the water is to separate the particles, and as it expands and rises the heated particles fly off and upward from the others, or colder particles.   They do not attract the colder particles or draw them after themselves or do any work whatever in that regard.   The tendency is to repel.   Says Tyndal:

"The motion of these atoms is communicated to the boiler, thence to the water, whose particles are shaken asunder, and fly from each other with a

repellent energy commensurate with the heat communicated. * * * Therefore we may reasonably conclude that this motion or vibration is heat, or the repulsive power. Heat, then, or that power which prevents the actual contact of the corpuscles of bodies, and which is the cause of our peculiar sensations of heat and cold, may be defined a peculiar motion, probably a vibration of the corpuscles of bodies, tending to separate them. It may with propriety be called the repulsive motion."

The rising of the heated particles tending to push the water above has a tendency to create a vacuum into which the colder water below, if below, or to one side, immediately rushes. As precisely the same operation is going on at each heater they act independently. The pipe bringing the steam into the heater or drum has nothing to do with giving direction to the heated water, nor does the steam of itself or its application to the pipe containing the water. Brought into contact with such pipe a portion of the heat in the steam is immediately transferred to the water through the metal side of the pipe, and that water when sufficiently heated moves immediately upward, and if there be a pipe leading generally upward from that point it will follow it. If the pipe be horizontal with an opening somewhere the heated water will follow on the upper side of the pipe moving towards the opening. I assume that by "heat conveying medium" in the above quotation is meant the heated water, inasmuch as it conveys the heat transferred to it to the different points of radiation which are or may be all along the water pipes. As before stated neither heater does anything to "give direction to the heat conveying medium." Natural laws do that if the water conducting pipes are so constructed as to allow them to operate. If there be a single pipe only and room for expansion—an expansion chamber—these natural laws will start a circulation in that single pipe, the up current hot or warm, the down current by its side colder, and the colder water will be constantly sinking, seeking the lowest level and hence returning to the heater.

It is not sufficient to avoid the statement that these two heaters are mere aggregations to show that both contribute to the effective heating of the car—the final result sought, the final object to be attained. To avoid the charge of aggregation "each element of the combination must qualify every other." Pickering v. McCullough, 104 U. S. 310, 26 L. Ed. 749. "The combination to be patentable must produce a different force, or effect, or result in the combined force or processes from that given by their separate parts. There must be a new result produced by their union. If not so, it is only an aggregation of separate elements." Reckendorfer v. Faber, 92 U. S. 347, 357, 23 L. Ed. 719. "A combination of well-known separate elements, each of which, when combined, operate separately and in its old way, and in which no result is produced which cannot be assigned to the independent action of one or the other of the separate elements, is not patentable." Thatcher Heating Company v. Burtis, 121 U. S. 286, 290, 291, 292, 294, 295, 7 Sup. Ct. 1034, 1038, 30 L. Ed. 942. All that Searle did was to add a second heater in a hot water circulating system. But it is said that he located one of them more advantageously than before; that is, at substantially the lowest point of the circuit. But as this had been done before, and repeatedly, I do not think he can claim that

idea. But assume that he can, inasmuch as the circulating system was old and the heater was old when in any circulating system, what Searle accomplished was simply the advantageous location of this second heater within the circulating system. To do this was not patentable invention. Thatcher Co. v. Burtis, page 290 of 121 U. S., page 1036 of 7 Sup. Ct. (30 L. Ed. 942). He has not mentioned or claimed any new or improved means for bringing the two heaters or either of them into the system or for adjusting them or either of them when there. Each is placed in the system in the old way and adjusted in the old way and by the old means. One, it is asserted but not shown, is in a new location in the system. Admit, if we will, for the argument, that this is true, and that this is a better system than any of the prior ones, that fact does not make the combination patentable. Thatcher Heating Co. v. Burtis, pages 290, 294 of 121 U. S., pages 1036, 1038 of 7 Sup. Ct. (30 L. Ed. 942). I cannot distinguish this case in principle from the Thatcher Case just referred to. In that case what Thatcher did was to combine in one structure, for the better heating of rooms or a building, by securing a uniform and steady heat that could be regulated by the occupants of the upper rooms and by means of a heater that did not require frequent attention (see page 291 of 121 U. S., page 1036 of 7 Sup. Ct. [30 L. Ed. 942])—all of which he accomplished—a cyclinder or body of the heater projecting out from the frame or mantel; a feeder or fuel magazine within the cylinder, and an opening through which the magazine was fed from above. He thus increased the capacity of the magazine and extended the feeder or magazine to the feed hole so as to allow an uninterrupted passage of coal from above instead of through the front or side doors. Each element was old, but they had not been used in combination. Judge Wallace in the Circuit Court said (12 Fed. 569):

"Inasmuch as the heater was old, and the fuel receptacle with the described opening was old when located within an ordinary coal stove, what Thatcher accomplished was merely the advantageous location of the fuel receptacle within the fireplace heater. * * * It must be conceded that it was not obvious that such a fuel magazine could be advantageously employed in such a heater. Attempts had been made by others to do the same thing without satisfactory results, but Thatcher's organization was a success, and immediately commended itself to the public. But Thatcher's broad claims cannot be sustained. There may have been patentable novelty in the means he employed to adjust the parts in the new organization but there was none in merely bringing those parts together. They did not perform any new function in the new arrangement. The fuel magazine does just the same work in the new structure it did in the ordinary coal stove. * * * The parts do not co-operate to produce a new result. By their aggregation the new structure contains all the advantages which resided before separately in several structures. The new heater is, therefore, a better heater than any which preceded it, but it does not present a patentable combination, irrespective of the means employed to adjust the several parts into efficient relations to each other."

The Supreme Court of the United States quoting and approving all this said:

"It is admitted that what Thatcher did, and all that he did, was to transfer this well-known fuel magazine from its use in an out-standing base-burning stove to a fireplace heater, equally well known and in common use as to its arrangement, construction, position, and mode of operation. When this fuel magazine was thus transferred from one kind of stove to another, in its

new situation it performed precisely the same function, with respect to the fuel and the fire, as it had always been accustomed to perform in its old place, and the fireplace heater into which it was thus newly placed, so far as the generation and transmission of heat and heated air are concerned, operated precisely as it had habitually done before. It is true that such a fireplace heater, by reason of the fuel magazine, was a better heater than before, just as the outstanding stove with its similar fuel magazine was a better heater than a similar stove without such a fuel magazine. But the improvement in the fireplace heater was the result merely of the single change produced by the introduction of the fuel magazine, but one element in the combination. The new and improved result in the utility of a fireplace heater cannot be said to be due to anything in the combination of the elements which compose it, in any other sense than that it arises from bringing together old and well-known separate elements, which, when thus brought together, operate separately, each in its own way. There is no specific quality of the result which cannot be definitely assigned to the independent action of a single element. There is, therefore, no patentable novelty in the aggregation of the several elements, considered in itself. If, however, to adapt these several elements to each other, so that they can act together in one organization, required the use of means not within the range of mere mechanical skill, then it would be true that the invention of such means for effecting a mutual arrangement of the parts would be patentable. If, in the present case, owing to the necessary form, size, structure, and situation of a fireplace heater as ordinarily made and used, there were ascertained difficulties in uniting such a fuel magazine as Thatcher adopted from its known use in out-standing base-burning stoves, and those difficulties were overcome by something more than mere mechanical ingenuity, he might have been entitled to a patent, not for the combination, however made, of the fuel magazine and the fireplace heater, but for the means which he had invented for effecting it. Nothing of that, however, appears in this case. The invention described is not of any such device for effecting the combination; no claim is made of that character. The claim made is for the combination, no matter how or by what means it is or may be effected."

So here, the improvement in the circulating system is the result of the single change produced by the introduction of this second heater and "there is no specific quality of the result which cannot be definitely assigned to the independent action of a single element." No new function whatever is evolved from this combination and hence it is not patentable, all the elements being old. Specialty Mfg. Co. v. Fenton Mfg. Co., 174 U. S. 492, 498, 19 Sup. Ct. 641, 643 (43 L. Ed. 1058) where it is held:

"Putting the Hoffman patent in its most favorable light, it is very little, if anything, more than an aggregation of prior well-known devices, each constituent of which aggregation performs its own appropriate function in the old way. Where a combination of old devices produces a new result such combination is doubtless patentable, but where the combination is not only of old elements, but of old results, and no new function is evolved from such combination, it falls within the rulings of this court in Hailes v. Van Wormer, 20 Wall. (U. S.) 353, 368, 22 L. Ed. 241; Reckendorfer v. Faber, 92 U. S. 347, 356, 23 L. Ed. 719; Phillips v. Detroit, 111 U. S. 604, 4 Sup. Ct. 580, 28 L. Ed. 532; Brinkerhoff v. Aloe, 146 U. S. 515, 517, 13 Sup. Ct. 221, 36 L. Ed. 1068; Palmer v. Corning, 156 U. S. 342, 345, 15 Sup. Ct. 381, 39 L. Ed. 445; Richards v. Chase Elevator Co., 158 U. S. 299, 15 Sup. Ct. 831, 39 L. Ed. 991. Hoffman may have succeeded in producing a shelf more convenient and more salable than any which preceded it, but he has done it principally, if not wholly, by the exercise of mechanical skill."

And, if adding this second heater in the circulating system at substantially the lowest point does add to the efficiency of the system, aids the circulation, and increases the heat carried thereby and radi-

ated into the car, as it is done in obedience to the same law and in the same way and by the same means and only by an increase of the heat, power employed and applied, a mere duplication, it is "a mere difference in degree, a carrying forward of an old idea, a result, perhaps somewhat more perfect, but not rising to the dignity of invention." Wright v. Yuengling, 155 U. S. 47, 53, 54, 15 Sup. Ct. 1, 39 L. Ed. 64, and cases there cited. The court said, pages 53 and 54 of 155 U. S., page 4 of 15 Sup. Ct. (39 L. Ed. 64):

> "Wright's only invention, then, was in the combination of the cylindrical guide with the trough shown in the Farrar patent. Did this accomplish a new and valuable result it is quite possible that a patent therefor might have been sustained, but we do not find this to be the case. The cylindrical guide performs the same functions as in the prior patents; the trough, in which the connecting rod works in the Farrar patent, is practically the same as in the Wright patent, and the combination is a mere aggregation of their respective functions. If the combination of the trough and cylindrical guide of the Wright patent gives greater lightness and strength to the frame than the combination of the trough and the flat guides of the Farrar patent, it is a mere difference in degree, a carrying forward of an old idea, a result perhaps, somewhat more perfect than had hitherto been attained, but not rising to the dignity of invention. We have repeatedly held patents of this description to be invalid. Stimpson v. Woodman, 10 Wall. (U. S.) 117, 19 L. Ed. 866; Smith v. Nichols, 21 Wall. (U. S.) 112, 22 L. Ed. 566; Guidet v. Brooklyn, 105 U. S. 550, 26 L. Ed. 1106; Hall v. Macneale, 107 U. S. 90, 2 Sup. Ct. 73, 27 L. Ed. 367."

See, also, Brinkerhoff v. Aloe, 146 U. S. 515, 516, 13 Sup. Ct. 221, 224 (36 L. Ed. 1068) where it is said:

> "To sustain a patent on a combination of old devices it is well settled that a new result must be obtained which is due to the joint and co-operating action of all the old elements. Either this must be accomplished, or a new machine of distinct character and function must be constructed. Pickering v. McCullough, 104 U. S. 310, 26 L. Ed. 749; Hailes v. Van Wormer, 20 Wall. 353, 22 L. Ed. 241; Tack Co. v. Manufacturing Co. (C. C.) 3 Fed. 26, 9 Biss. 258; Wringing Machine Co. v. Young, 14 Blatchf. 46, Fed. Cas. No. 9,508. If several old devices are so put together as to produce even a better machine or instrument than was formerly in use, but each of the old devices does what it had formerly done in the instrument or machine from which it was borrowed and in the old way, without uniting with other old devices to perform any joint function, it seems that the combination is not patentable."

In Am. C. M. Co. v. Helmstetter, 142 Fed. 978, the Circuit Court of Appeals, Second Circuit, said (page 980, 74 C. C. A. 240, page 242):

> "The fact that the two devices are not separately claimed, but only in combination, would indicate that the patentee regarded the elements individually considered as old. The distinction between a combination and an aggregation lies in the presence or absence of mutuality of action. To constitute a combination it is essential that there should be some joint operation performed by its elements, producing a result due to their joint and co-operating action, while in an aggregation there is a mere adding together of separate contributions, each operating independently of the other. Hailes v. Van Wormer, 20 Wall. 353, 25 L. Ed. 241; Reckendorfer v. Faber, 92 U. S. 347, 357, 23 L. Ed. 719; Pickering v. McCullough, 104 U. S. 310, 318, 26 L. Ed. 749."

Here, these heaters do not act jointly, but each separately, independently. They both operate at the same time on the water in the pipe but each transfers heat in its own way at its point of operation and the heat from the one is simply added to that of the other or goes

to supply a loss of heat by radiation. See, also, Dodge Coal Storage Co. v. N. Y. C. & H. R. R. Co., 139 Fed. 976, affirmed by Circuit Court of Appeals, Second Circuit, 150 Fed. 738, 80 C. C. A. 404.

The Searle patent in suit is void for want of patentable invention in view of the prior art; and the introduction of the second heater at substantially the lowest point of the circuit was a mere aggregation of old, well-known devices; and this location of one heater at that point was not the idea of Searle, but of the Examiner at the Patent Office, suggested to him by the prior art which he cited, and then adopted by Searle and formulated into a claim about four years after his application was filed, and after such location and duplication of heaters in such a system had gone into general use, and after his original claims had been rejected. But more than this, in view of the art as it existed in 1887–1888, ordinary mechanical and engineering skill was fully competent to do all that Searle did or claims to have done. The defendant company was making and selling a circulating system with more than one transfer heater in its ascending pipes two years or more before Searle formulated such a claim. Complainant's Exhibit No. 26, said to show defendant's construction, presents two "lower transfer heaters" beneath the car floor and two "transfer heaters" above it, and also a third, or emergency heater. Defendant has an improved system of is own, and has a separate circuit for each side of the car. It has placed two of its transfer heaters where Pike placed his in 1872, where Weibel placed his in 1873, and where Duffield placed his in 1877 (see patents Nos. 124,973, 144,425, and 194,418), underneath the car and at, or even below, substantially the lowest point of the circuit.

I have carefully examined the testimony of complainant's witnesses Freeman and Carpenter and all the evidence of tests. I will not go into it as to my mind it fails to establish any joint action, co-operation, co-action of the two heaters in the sense of the patent law. Again, if we accept that theory, for it is, at best, but a mere speculative theory, defendant's system does not work in accordance with it. Defendant divides his circuit into two equal portions, and uses his heaters to renew the heat in the water at distant points, and not to enable the one to operate differently from what it would standing alone in the circuit. That is, he does not place them near together so as to enable the one to perform some different function than it otherwise would by having hot water to operate on, or in having hot water operate on it.

### Dixon Patent.

As to the Dixon patent I think the defense of laches is clearly established; also that of noninfringement. An essential element of that patent which has but one claim is a cock located in the lower drum for discharging the water of condensation. This cock the defendant does not use with the steam heater. In short, it wholly omits an element of Dixon which he made essential by specifically inserting and claiming it in his combination located at a certain point. The Dixon patent followed the Searle patent in suit and several others. He filed broad claims which were rejected and canceled. Others were sub-

stituted only to be rejected and canceled. Then came the narrow claim in suit and of it he said, by his attorneys, "The claim is specific, and covers a peculiar organization of parts only shown by Dixon." He must be limited to this "peculiar organization." He was in no sense a pioneer. He has submitted to limitations and restrictions imposed by the Patent Office, and has also expressly limited himself. I think it well said that the distinction between this specific claim and the rejected and canceled claim is that the claim in suit specifies the cock, f, near the expansion tank, and which cock controls the admission of steam to the drums, first, the upper drum, and thence through pipes or a pipe to the lower drum, and the cock, h, in the lower drum, under the car, for discharging the water of condensation. This is not defendant's construction or organization. Defendant for a specific purpose places its cock for discharging the water of condensation in the main steam pipe under the car, and at a point where it will not freeze when the drum is not heated. Of course the location of this cock is not fundamental in the claim. It has no new main or fundamental idea. It is apparent also that defendant has a peculiar organization of old elements which materially differs from that of the Dixon patent. However, when a claimant, contesting with a score of others in the same field and at the same time, after repeated rejections, in order to obtain a patent at all, adopts and specifies as his invention a "peculiar organization" of parts and specifies and specifically names and locates those several parts he is held to the peculiar organization so particularized, specified and claimed.

But after all, the laches of complainant, unexplained and not excused, should defeat this action so far as the Dixon patent is concerned. That patent applied for in 1888, as limited and changed, was finally granted in August 11, 1891, over 10 years prior to the commencement of this suit. In 1890, and the evidence is not disputed, the defendant, a competitor of the complainant, commenced making, advertising, and selling car-heating apparatus and devices like those now alleged to infringe. There is no question that those devices infringed the Dixon claim if the ones now complained of do. There can be no question that the complainant knew just what defendant was doing. There was no possible concealment or covering up. When those devices went into use they were plain to see, and open to inspection by all the world, and it is impossible to suppose that complainant did not keep its eye on what defendant was doing. I do not think the complainant ever expected to rely on the Dixon patent as a valid patent or as broad enough to cover the defendant's construction. The following cases are sufficiently in point and all are directly applicable: Lane & Bodley Co. v. Locke, 150 U. S. 193, 14 Sup. Ct. 78, 37 L. Ed. 1049; Richardson v. D. M. Osborne & Co., 93 Fed. 828, 36 C. C. A. 610; McLaughlin v. People's R. Co. (C. C.) 21 Fed. 574; Woodmanse & Hewitt Mfg. Co. v. Williams, 68 Fed. 489, 15 C. C. A. 520; Meyrowitz Mfg. Co. v. Eccleston (C. C.) 98 Fed. 437; Starrett v. Stevens Arms Co. (C. C.) 96 Fed. 244—all patent cases. Speidel v. Henrici, 120 U. S. 377, 387, 7 Sup. Ct. 610, 30 L. Ed. 718; Abraham v. Ordway, 158 U. S. 416, 15 Sup. Ct. 894, 39 L. Ed. 1036; Penn Mutual Life Ins. Co. v. Austin, 168 U. S. 685, 697, 18 Sup. Ct. 223, 42 L.

Ed. 626; Gildersleeve v. N. M. M. Co., 161 U. S. 573, 16 Sup. Ct. 663, 40 L. Ed. 812; Gill v. U. S., 160 U. S. 426, 16 Sup. Ct. 322, 40 L. Ed. 480.

In my judgment it would be inequitable to permit an interference with defendant in its business on the ground of alleged infringement of this Dixon patent after a delay of over 10 years in bringing suit during all of which time without protest it was making and selling the devices now alleged to infringe, especially in view of the narrow character of the Dixon claim, its doubtful validity, and the great doubt that infringement has been committed. This delay would seem to be an admission either that the Dixon patent is invalid in view of the prior art or that defendant does not infringe.

There will be a decree dismissing the bill, with costs.