## GILDERSLEEVE v. NEW MEXICO MINING COM-PANY.

APPEAL FROM THE SUPREME COURT OF THE TERRITORY OF NEW MEXICO.

No. 89. Argued December 2, 3, 1895. — Decided March 16, 1896.

In an appeal from a judgment of a territorial court, with no exceptions to rulings of the court on the admission or rejection of testimony this court is limited in its review to a determination of the question whether the facts found are sufficient to sustain the judgment rendered.

The court bases its conclusion in this case upon the fact that the record exhibits such gross laches on the part of complainant, or those with whom he is in privity, and upon whose rights his own must depend, as to effectually debar him from a right to the relief which he seeks.

THE relief sought by appellant in the lower court was to have the New Mexico Mining Company, to whom certain letters patent were issued by the United States for a Mexican mining grant, declared a trustee for his benefit to the extent of a one fourth interest in the land covered by said letters patent.

The Territorial District Court held that the statute of limitations barred the suit, and therefore dismissed the bill. The Supreme Court of the Territory affirmed the decree of dismissal, 27 Pac. Rep. 318, holding the plea of the statute of limitations good, and also sustained the mining company's contention that Mrs. Ortiz, under whom they claimed, acquired title through a valid mutual will executed by herself and her husband in 1841. The cause was then brought to this court by appeal. From the findings in the record the following facts are extracted:

The property in controversy covered by the United States patent embraced a mining grant made by the government of Mexico in 1833, to José Francisco Ortiz and Ignacio Cano. This grant consisted of a gold mine or vein, and a small ex-

tent of surface ground, as also commons of pasture and water to the extent of four leagues from each of the four cardinal points of the mine. Some time prior to the cession of New Mexico to the United States, under the treaty of February 2, 1848, Cano sold and transferred all his interest in the grant in question to Ortiz his coöwner. On August 15, 1841, Ortiz and his wife executed before a Mexican alcalde and two attending witnesses a mutual will, in which it was provided that the survivor should be the universal legatee or heir of the other to all the property, both real and personal, of every kind whatsoever. Ortiz died before his wife, July 22, 1848, at Santa Fé, New Mexico, and thereupon Mrs. Ortiz entered into the possession of the mine and the enjoyment of the privileges connected therewith, and retained this possession up to December 20, 1853, when she sold and delivered the possession thereof to John Greiner, the deed to whom was recorded in the office of the probate clerk of Santa Fé County on December 29, 1853. Greiner remained in possession until August 19, 1854, when he transferred the property to Elisha Whittlesley and six others. Contemporaneous with the execution of the deed to Whittlesley et als., they and one other person executed articles of association under the name of the New Mexico Mining Company, and on February 1, 1858, the members of the association were incorporated by the legislature of the Territory of New Mexico, under a similar designation.

On November 8, 1860, Whittlesley et als., as representing the New Mexico Mining Company, petitioned the then surveyor general of the Territory to examine their title to said grant. That official complied with the request and made a favorable report to Congress, which, by an act approved March 1, 1861, 12 Stat. 887, c. 66, confirmed the grant, the claim being designated as private land claim No. 43. A survey of the grant was thereafter made and was completed on August 14, 1861, but such survey was not approved by the Secretary of the Interior until April 22, 1876. On May 20, 1876, a patent issued in the name of the New Mexico Mining Company, the lands embraced therein being stated to

contain 69,458.33 acres, less 259 acres in conflict with another grant.

In addition to the possession by Mrs. Ortiz, before stated, her grantee, Greiner, and his assigns held actual, open, and notorious possession of the property in question from the conveyance to Greiner in December, 1853, until the commencement of this litigation in 1883. Such possession was held by employing an agent or agents to live on the property at the village of Dolores, near the said mine, and by making large and extensive improvements on the property, in building a large stamp mill at Dolores, near said mine, and many other acts, open and notorious, indicative of ownership of the property. No attempt was ever made by those through whom Gildersleeve claimed to interfere with such possession or enjoyment of the property, or to actively assert any right or interest in said property, except through a suit brought in 1880 by Brevoort, as hereinafter stated. None of said parties ever intervened in the proceedings instituted before the surveyor general looking to the confirmation of the grant to the New Mexico Mining Company, nor after the surveyor general's report to Congress was an objection raised to the passage of the act confirming the grant, nor, indeed, at any time did the complainant or those under whom he claims object to the mining company's assertion of title to the property, or to the issuance of letters patent to the company.

The complainant bases his right to the equitable relief prayed for in his bill upon the assertion that the authentic mutual will of Ortiz and his wife heretofore referred to was void, because not executed with the formalities required by law as to the number of witnesses, etc., and that, subsequently, Ortiz died intestate, leaving no direct but certain collateral heirs, who conveyed in 1873 the interest inherited, by them, from Ortiz to one Brevoort, who, in 1880, conveyed an undivided one half interest in the property thus acquired by him jointly to appellant and Knaebel. The consideration of the last conveyance from Brevoort to Gildersleeve and Knaebel, they being attorneys at law, was money advanced and services rendered and to be rendered to Brevoort for the maintenance

of a suit then or about to be instituted to enforce Brevoort's alleged title to the mine.

. At the July, 1880, term of a District Court of the Territory, Brevoort, through the attorneys in question, filed a bill against the New Mexico Mining Company, asserting his equitable title to an undivided interest in the land covered by the patent, but after the taking of testimony, and the hearing of exceptions, upon the report of a master, the court on July 16, 1884, dismissed the cause.

At the February term, 1883, of the same court certain alleged heirs and legal representatives of Ignacio Cano instituted suit against the New Mexico Mining Company . and others, based upon the claim that Cano had never conveyed his interest in the mine to Ortiz, and that in consequence he was seized at the time of his death of an undivided interest in the property. The court, however, sustained the plea of a former adjudication based on an action which had been instituted in 1865 by the same persons or others with whom they were in privity, and dismissed the bill. Brevoort was a party defendant to this second suit of the Cano claimants. · He filed a cross-bill denying the rights of the heirs of Cano and setting up title in himself to an undivided part of the mine and land covered by the patents by virtue of the conveyances aforesaid from the collateral heirs of Ortiz, and asked the same relief as that prayed for in his former suit. Subsequently, the mining company compromised their controversy with Brevoort and Knaebel, and Brevoort was dismissed from the cause. Thereupon Gildersleeve intervened and was permitted by the court to set up his rights, under the conveyance from Brevoort to himself, with the same effect as though he had originally been made a defendant. The court, treating the compromise between Brevoort and the mining company as inoperative against Gildersleeve, by its order allowed Gildersleeve to assert his rights, *nunc pro tunc*, as if they had been advanced at the time Brevoort filed his cross-bill.

The issue thus formed between Gildersleeve and the New Mexico Mining Company thereupon proceeded as a new action, with Gildersleeve as complainant.

In 1880 the mining company transferred the property embraced in the letters patent to Stephen B. Elkins and Jerome B. Chaffee, but the greater portion of the property was reconveyed to the company in 1884.

It is not material, however, to notice the disposition made by Chaffee and Elkins of the land not reconveyed by them to the mining company.

The issue between Gildersleeve and the mining company, as heretofore stated, resulted adversely to complainant in the territorial courts.

*Mr. Thomas Smith,* (with whom was *Mr. H. L. Warren* on the brief,) for appellant.

*Mr. Joseph Larocque* for appellee.

MR. JUSTICE WHITE, after stating the case, delivered the opinion of the court.

The appeal being from a judgment of a territorial court, and no exceptions to rulings of the court on the admission or rejection of testimony being presented for our consideration, we are limited in our review to a determination of the question whether the facts found are sufficient to sustain the judgment rendered. *Haws* v. *Victoria Copper Mining. Co.,* 160 U. S. 303, 312.

In the trial court, the controversy between Gildersleeve and the mining company was disposed of upon the ground that the statute of limitations barred complainant's right to recover. The Supreme Court of the Territory, however, rested its judgment of affirmance not only upon the bar of the statute, but upon the further fact found by it that Ortiz and his wife had executed a valid mutual will, by which, upon the death of Ortiz, title to the mine in question vested in his widow, through whom the mining company claimed.

We shall, however, consider the case in another aspect, and shall base our conclusion that the complainant is not entitled to relief at the hands of a court of equity upon the fact that

the record exhibits such gross laches on the part of complainant, or those with whom he is in privity, and upon whose rights his own must depend, as to effectually debar him from a right to the relief which he seeks.

. In *Hammond* v. *Hopkins*, 143 U. S. 224, 250, speaking through Mr. Chief Justice Fuller, this court said: "No rule of law is better settled than that a court. of equity will not aid a party whose application is destitute of conscience, good faith and reasonable diligence, but will discourage stale demands, for the peace of society, by refusing to interfere where there have been gross laches in prosecuting rights, or where long acquiescence in the assertion of adverse rights has occurred."

In *Galliher* v. *Cadwell*, 145 U. S. 368, 371, speaking through Mr. Justice Brewer, it was said of the case then being considered: "The question of laches turns not simply upon the number of years which have elapsed between the accruing of her rights, whatever they were, and her assertion of them, but also upon the nature and evidence of those rights, the changes in value, and other circumstances occurring during that lapse of years. The cases are many in which this defence has been invoked and considered. It is true, that by reason of their differences of fact no one case becomes an exact precedent for another, yet a uniform principle pervades them all."

In *Speidel* v. *Henrici*, 120 U. S. 377, 387, the court said, speaking through Mr. Justice Gray: "Independently of any statute of limitations, courts of equity uniformly decline to assist a person who has slept upon his rights and shows no excuse for his laches in asserting them. 'A court of equity,' said Lord Camden, 'has always refused its aid to stale demands where the party slept upon his rights, and acquiesced for a great length of time. Nothing can call forth this court into activity but conscience, good faith and reasonable diligence; where these are wanting, the court is passive and does nothing. Laches and neglect are always discountenanced, and, therefore, from the beginning of this jurisdiction, there was always a limitation to suits in this court.'"

In *Lane & Bodley Co.* v. *Locke,* 150 U. S. 193, and *Mackall* v. *Casilear,* 137 U. S. 556, it was declared to be correct doctrine that the mere assertion of a claim unaccompanied by any act to give effect to it, could not avail to keep alive a right which would otherwise be precluded.

With the principles enunciated in these decisions to guide us, we proceed to review the pertinent facts showing the conduct of the persons in whom complainant contends the title to the mine vested upon the death of Ortiz in 1848, by reason of the alleged intestacy of the latter.

It is undisputed, if the claim of the collateral heirs of Ortiz as to the nullity of the will executed by Ortiz was well founded, whatever title Ortiz had to what is now known as the Ortiz mine vested in them upon the decease of Ortiz in 1848, subject to such confirmation by the United States as the law required. By article VIII of the treaty of Guadalupe Hidalgo of 1846, 9 Stat. 922, 929, this government agreed to respect rights of private property in the ceded territory in existence at the date of the cession. To carry into effect this agreement, Congress passed an act entitled "An act to establish the office of surveyor general of New Mexico, Kansas and Nebraska, to grant donations to actual settlers therein, and for other purposes," which act was approved July 22, 1854. 10 Stat. 308, c. 103. By section eight of this act it was made the duty of the surveyor general, under rules and regulations to be established by the Secretary of the Interior, to inquire into and report to Congress upon the validity or invalidity of all claims to lands within the territory ceded by Mexico which had originated before such cession, which report was to be laid before Congress for such action thereon as might be deemed to be just and proper, with a view to the confirmation of *bona fide* grants. This act has been considered by this court. *Stoneroad* v. *Stoneroad,* 158 U. S. 240; *Astiazaran* v. *Santa Rita Mining Co.,* 148 U. S. 80, and cases cited in the latter case.

The finding of facts does not recapitulate the various steps in the proceedings initiated, by the mining company through Whittlesley, before the surveyor general under the act of 1854

to acquire a patent to the mining grant. Knowledge, in the collateral heirs of Ortiz, of the passage of the act in question and of their right to file a claim with the surveyor general is, of course, to be presumed. It has not been asserted, however, that these collateral heirs ever submitted their alleged title to the surveyor general for examination, or entered objection to the validity of the claim to ownership of the entire grant filed with that official by the New Mexico Mining Company. It is also not pretended after the surveyor general had reported the entire grant to Congress for confirmation, as belonging to the New Mexico Mining Company, that the alleged collateral heirs of Ortiz ever in any way presented their pretensions to that body, or raised any objection to the confirmation by Congress of the grant in the manner and form recommended by the surveyor general, and after the grant was confirmed by Congress, in the long interval which elapsed before the issue of the patent, (from 1861 to 1876,) there is also no pretence that the collateral heirs of Ortiz ever before any administrative officer of the government asserted the existence in themselves of the rights now advanced by them as the basis for the equitable relief which they seek. Indeed, the record shows that during twenty-two years, between the passage of the act of 1854 and the issue of the patent in 1876, the collateral heirs remained supinely indifferent to the assertion of their supposed title, while during the greater portion of this time the New Mexico Mining Company was expending labor and incurring the expense connected with the obtaining of the letters patent. So, also, these alleged heirs from the date of the death of Ortiz permitted Mrs. Ortiz, Greiner, and those holding under him, including the mining company, to remain in undisturbed possession of the property and to engage in large outlay for its development without, so far as appears, even claiming rights in themselves, until more than four years had elapsed from the final granting of the patent. It is proper also to observe that when the first suit was brought in 1880 it was commenced, not on behalf of the collateral heirs of Ortiz, but was initiated for the benefit of one, who, with full knowledge of all the circumstances, acquired the supposed title of such

collateral heirs, for the purpose of speculating upon the chance of wresting from the mining company the title acquired by it under the patent, although at that time the laches of the collateral heirs, whose rights the suit championed, had effectually debarred them from invoking the aid of a court of equity to relieve them from the results of their own acquiescence and neglect.

It is true, as held in *Johnson* v. *Towsley,* 13 Wall. 72, that where the title to land had passed from the government, and the question becomes one of private right, courts may inquire whether the party holding the patent should be treated as owning it absolutely in his own right or as a trustee for another, and, therefore, that courts of equity have the power to inquire into and correct mistakes, injustice and wrong. But when the aid of a court of equity is invoked in effect to annul the confirmation by Congress or to overrule the final conclusion of the administrative department as to the person entitled to a patent from the United States, the fact that the complainant who asks such equitable relief, theretofore possessed not only ample opportunity to assert his own claim, but also abundant occasion to contest the right of the person to whom a patent was granted, has completely failed to do either, and has been guilty of the grossest and most inexcusable laches, is necessarily a conclusive reason against the allowance of the relief asked.

When Brevoort acquired his alleged rights, in 1873, the New Mexico Mining Company was in possession of the property, and Brevoort knew this fact. When on June 30, 1880, Brevoort executed the conveyance of an undivided interest to Gildersleeve and Knaebel for the consideration of their assistance by advance of money or otherwise in contemplated litigation with the mining company, Brevoort's grantees knew the fact to be that he was not in possession, and that the New Mexico Mining Company was in actual possession.

To recapitulate, there was an uninterrupted use and enjoyment by the widow of Ortiz, and those claiming by conveyance from her of the property in question, from the death of Ortiz in 1848; no attempt was ever made to assert rights, if

any, of the collateral heirs of Ortiz in this property until the year 1880. They stood by and witnessed the expenditure of large sums of money upon the property and did nothing exhibiting an intention to assert their supposed rights. No attempt was made in the pleading of Gildersleeve to offer any explanation of this long continued acquiescence in the rights of those in possession of the mine and of the privilege connected therewith. Under such circumstances, we think the heirs and those claiming under them are not entitled to equitable relief. Finding at the very threshold of the case the existence of such laches on the part of complainant as debars him from obtaining the equitable relief which he invokes, we have not deemed it necessary to express any opinion on the other questions presented by the record. The court below in the concluding sentences of its opinion aptly conveyed the reasons which, apart from a consideration of the other questions by it considered, demonstrates the entire want of equity in the complainant's case. The expressions to which we refer, by O'Brien, C. J., are as follows:

"Ortiz dies in 1848. The widow claims and asserts her rights under the will as the absolute owner of all the property of which he died possessed; she disposes of such rights to *bona fide* purchasers; for nearly forty years before this suit was commenced they occupy, improve and pay taxes on this property. Plaintiff's grantor and those through whom such grantor claims title, relatives of the deceased Ortiz, and residing in the vicinity of the grant, remain silent; acquiesce by such silence in the disposition so made of the property for so long a period, while the same is being enhanced in value by the capital and labor of honest purchasers or occupants. In fact, not a word is heard from any of the kindred in relation to the matter until they relinquish for a trifling consideration all their interest therein to plaintiff's grantor."

The judgment of the Supreme Court of the Territory is

*Affirmed.*