WOLF MINERAL PROCESS CORPORATION v. MINERALS SEPARATION NORTH AMERICAN CORPORATION.

Circuit Court of Appeals, Fourth Circuit.
April 12, 1927.

No. 2557.

1. Appeal and error ⬅➡1009(1)—On appeal in equity, appellate court is not bound by trial judge's findings of fact.

On an appeal in equity, the Circuit Court of Appeals is not bound by the trial judge's findings of fact as on a writ of error.

2. Appeals and error ⬅➡1009(4)—Findings of trial judge in equity case ought not be disturbed on appeal, unless clearly against weight of evidence.

Findings of trial judge in equity case, though not binding on appellate court, ought not be disturbed unless it clearly appears that he has misapprehended the evidence or gone against the clear weight thereof.

3. Master and servant ⬅➡62—Evidence held insufficient to show defendants discovered mineral separation process while experimenting with another process under plaintiff's employ.

Evidence held insufficient to show that patentees of process for mineral separation by froth flotation, made their discovery while conducting experiments with a bulk oil flotation process for plaintiff, so as to entitle plaintiff to benefit of their discovery.

4. Patents ⬅➡327(13)—Prior judgment held not to estop defendant from maintaining suit on different issues, though conclusive on issues involved.

Judgment in suit by metallurgists to recover agreed compensation for conducting experiments and supervising construction of plant, denying counterclaim alleging that plaintiffs, in violation of their confidential relationship, had obtained patent on process discovered in the course of such work, held not to estop defendant in that suit from subsequently maintaining a suit on different issues, though it was conclusive on all issues determined in that suit.

5. Equity ⬅➡21—Where confidential or fiduciary relationship exists, equity will protect person in position of dependence.

Where a confidential or fiduciary relationship exists, equity will exercise its jurisdiction to protect the person who is in a position of dependence from being imposed upon by those in whom he places reliance.

6. Patents ⬅➡328—787,814 for mineral separation process, involving flotation of mineral particles by buoyancy of oil, held not infringed.

Wolf patent, No. 787,814, covering a mineral separation process involving the flotation of mineral particles by the buoyancy of oil, held not infringed by process practiced under froth flotation patent.

7. Patents ⬅➡289(4)—Approximately ten years' delay in bringing infringement suit brought only eight days before patent expired held laches barring recovery.

Delay in bringing patent infringement suit from 1911 or 1912 until 1922 and just eight days before expiration of patent, held laches barring relief.

8. Equity ⬅➡77—Laches in instituting suit is not ordinarily excused by poverty.

Poverty is ordinarily no excuse for laches in instituting suit.

Appeal from the District Court of the United States for the District of Maryland, at Baltimore; John C. Rose and Morris A. Soper, Judges.

Suit for fraud and patent infringement by the Wolf Mineral Process Corporation against the Minerals Separation North American Cor-

poration. Judgment for defendant (7 F.[2d] 903), and plaintiff appeals. Affirmed.

Henry W. Anderson, of Richmond, Va., and Clifford E. Dunn, of New York City (William M. Chadbourne, Leonard A. Watson, Willis B. Rice, Clinton De W. Van Siclen, Carroll R. Ward, Alfred H. Phillips and Wellington S. Crouse, all of New York City, and Jacob F. Murbach, of Baltimore, Md., on the briefs), for appellant.

Henry D. Williams and Wm. Houston Kenyon, both of New York City, and Charles McH. Howard, of Baltimore, Md. (Lindley M. Garrison, of New York City, on the brief), for appellee.

Before WADDILL and PARKER, Circuit Judges, and GRONER, District Judge.

PARKER, Circuit Judge. The appellant, Wolf Mineral Process Corporation, complainant in the court below, is the assignee of a certain patent, No. 787,814, issued to one J. D. Wolf, covering a mineral separation process which involves the flotation of metal particles by the buoyancy of oil. It also holds by assignment the rights claimed by Wolf in the patent of defendant, Minerals Separation North American Corporation. Defendant is the assignee of patent No. 835,-120, issued to Henry Livingstone Sulman, Hugh Fitzalis Kirkpatrick-Picard, and John Ballot, covering the froth flotation process of mineral separation, which is fully described in the opinions of the Supreme Court in the cases of Minerals Separation, Limited, v. Hyde, 242 U. S. 261, 37 S. Ct. 82, 61 L. Ed. 286, and Minerals Separation, Limited, v. Butte, 250 U. S. 336, 39 S. Ct. 496, 63 L. Ed. 1019, in which the validity of the patent was sustained. The bill alleges fraud on the part of Sulman & Picard, two of the patentees under patent 835,120, in that, while employed in a confidential capacity as agents and consulting metallurgists for Wolf, they derived from him the ideas embodied in that patent, or discovered same while conducting experiments for him under a contract providing that all discoveries made in the course of such experiments should belong to him, and asks that a constructive trust be impressed on the patent in favor of complainant, and that defendant be required to account for profits realized therefrom. It also alleges that licensees of defendant, in carrying on processes which defendant has approved, have infringed the Wolf patent, numbered 787,814, and asks for an injunction and accounting. The answer denies the fraud

and infringement alleged, and pleads laches and certain other special defenses, which, in the view which we take of the facts, need not be considered. The learned District Judge, in an able opinion, in which he thoroughly reviewed and analyzed the evidence, held that there was neither fraud nor infringement. He dismissed the bill, and complainant brings the matter before us by appeal.

The facts necessary to an understanding of the points involved are as follows: Metals are generally found in ores in the form of oxides, sulphides, etc., which are imbedded in rock. To concentrate the metal, the ore must be crushed and some means devised to separate the metal particles from the particles of rock technically known as the gangue. The affinity of oil for the metal particles has long been known, and various processes have been patented seeking to separate the metal particles from the gangue by the use of oil.

In 1898, one Elmore, a British subject, discovered and patented a process for mineral separation, based upon the known affinity between oil and metal and the fact that oil has a lower specific gravity than water. It may be described as a bulk oil flotation process. Mineral bearing ore was finely ground and mixed with water. To this was added a large quantity of oil. The mixture was then gently agitated so as to bring the metal particles into contact with the oil and then allowed to settle. The oil would rise to the surface, bearing with it a large part of the metal content, and the gangue or rock would sink to the bottom. The oil was then drawn off and the metal particles separated therefrom. The Elmore process caused much discussion in scientific circles, but it was not commercially successful. It required too great a quantity of oil to be profitably used with low grade ores, and the necessity that the agitation employed be of a gentle character, so that the oil would not emulsify and fail to reagglomerate, made it impossible to treat "slimes," the very finely ground portions of the ore, which contain a large per cent. of the metal content.

In 1902, Wolf, a promoter resident in London, became interested in the oil flotation process of mineral separation. He conceived the idea that by violent agitation he could bring the oil into contact with the metal particles with the use of a smaller quantity of oil. His problem was to secure an oil which would not emulsify but reagglomerate after agitation. He disclosed this idea to Sir Frank Crisp, his solicitor in London, and was directed by him to Wade, a patent agent.

Wade directed him to one Scammell, who had recently patented a very viscous sulphochlorinated oil, for use in the manufacture of synthetic rubber. He and Scammell experimented with this oil for floating metal, and, at his suggestion, Scammell obtained a patent for the use of the oil in mineral separation, and he secured an option on the patent.

At the suggestion of Wade, Wolf then employed Sulman & Picard, metallurgists of London of high standing, to conduct experiments for the purpose of evolving a commercially practical process for mineral separation with the use of this viscous oil and violent agitation. The contract was signed February 5, 1903, and in it Sulman & Picard agreed to conduct the experiments for Wolf, to report the results of the experiments to him, to preserve the strictest secrecy in conducting experiments and investigations, and to give him the benefit of their knowledge and experience. They further agreed that all discoveries and inventions made or worked out by them or their assistants in the course of the investigations or experiments conducted for Wolf should belong to him. As bearing upon the sort of work which Sulman & Picard were expected to do, the following extract from the contract is pertinent:

"The chemists shall carefully investigate and carry out the tests on Scammells Oil Concentration process as suggested in their letter to Mr. Wolf dated the 15th November 1902 and shall endeavor to ascertain the proper proportion of chloride of sulphur to be used with various oils so as to obtain the best possible extraction of metals from the pulps and slimes of various typical ores to which such process may be applicable, and generally shall construct exact formulae for the most economical and efficient working of the said process on a commercial scale."

Experiments began under the contract on February 9th, and continued till April 21st. During this time, tests were made with various kinds of oil subjected to the sulphochlorination process, with different quantities of oil and with different types of agitation, but the evidence shows that all tests were directed towards what was distinctly a bulk oil flotation process. It was discovered that, as a result of the vigorous agitation, a part of the gangue was taken up with the metal, but that, by afterwards passing the oil with the metal concentrate through hot water, it became less viscous and dropped the particles of gangue which it had picked up, but held on to the particles of metal. It was also discovered that by blowing hot air or steam through the

tailings (the sandy residue left after the metal concentrate had been taken off), oil which had been caught therein would be released and thus saved for future use. These discoveries were duly reported by Sulman & Picard, and were incorporated in the process for which Wolf obtained patent numbered 787,814, which is the patent upon which complainant relies in its claim of infringement.

Sulman & Picard also supervised for Wolf the construction of a large scale plant in Eyre street, London, which was built to make further test of the process, but this plant proved a failure. The apparatus installed developed defects, and the type of oil used did not give successful results. After its failure, Sulman & Picard made recommendations with regard to changes in apparatus and in oil, but these were apparently not followed up. Wolf failed to pay the full amount promised for supervising the construction of the plant, and Sulman & Picard instituted action against him to recover the balance due under the contract. Wolf admitted the contract, but pleaded as a counterclaim that Sulman & Picard, in breach thereof and of the duty arising from the confidential relationship sustained to him, had obtained patents in the summer or early fall of 1903 on a bubble flotation process of mineral separation and also one on an oil-spraying process, the ideas back of which Wolf alleged that they had obtained from him or from experiments made for him. This action was heard in the High Court of Justice in London, before Mr. Justice Buckley, in the year 1905. The counterclaim was heard on the merits, and the issue involved was decided against Wolf; judgment being rendered in favor of Sulman & Picard for the full amount of their claim.

The foregoing covers the dealings had between Wolf and Sulman & Picard. It remains for us to consider the discovery of the process covered by defendant's patent, and certain circumstances relied upon by plaintiff to establish fraud. When Wolf entered into the contract with Sulman & Picard on February 5, 1903, they were at work on a mineral separation process involving the use of oil, of which fact they duly informed him, but stated that they did not think that there was any conflict between the two processes. The process upon which they were at work was a metal sinking process, covered by a patent issued to one Cattermole, in which they acquired an interest a short while later. The Cattermole process, in brief, was to mix finely ground ore with water and then add oil

to the amount of about 6 per cent. on the ore. The mixture was then violently agitated, and the oil was thereby divided into small particles. The metal particles attached themselves to these particles of oil, forming small globules, which, because of their weight, sank to the bottom of the mixture. These globules had some gangue in them, but they were caused to pass through a vessel containing an upward flowing current of water of sufficient strength to carry off the gangue but allow the metal particles to sink.

Sulman & Picard were at work on the Cattermole process from 1902 to 1905, during which time they completed a model Cattermole plant and sent it to Australia for demonstration there. In March, 1905, one Higgins, an employee in their laboratory, was making experiments with the Cattermole process, when he discovered, almost accidentally, the froth flotation process. The testimony is that he was testing the effect of reducing the quantity of oil in the Cattermole process, when he discovered that when oleic acid was used as the oil and reduced to less than 1 per cent. on the ore, the violent agitation of the Cattermole process was followed, not by the formation of metal granules which sank to the bottom, but of a mineral bearing froth which rose to the top. As a result of this discovery, a patent was obtained by Sulman & Picard and Ballot, their associate in the development of the Cattermole process, which is defendant's patent No. 835,120 in suit here. The process of that patent has been aptly described as an air or froth flotation process, as the mineral particles are raised to the surface of the mixture, not by the buoyancy of oil but by the buoyancy of air. The metal particles become attached to air bubbles, and the particles and the bubbles rise to the surface in a mineral bearing froth in which oil is perceptible to no sense except that of smell. The process covered by the patent is this: Finely ground ore is mixed with water. To this is added less than 1 per cent. on the ore of oleic acid or other frothing oil. The mixture is violently agitated and then allowed to settle. The gangue sinks to the bottom of the mixture, while the metal rises to the top in a froth and is floated off.

The contention of complainant is that the froth flotation process was not in fact discovered by Higgins in 1905, but that the idea back of it was either derived by Sulman & Picard from the process described to them by Wolf, which involved reduction of the quantity of oil with violent agitation, or was discovered by them in the experiments conduct-

ed for him. In support of this contention, complainant relies upon the fact that the froth flotation process requires violent agitation, and that the quantity of oil used is greatly reduced. It also relies upon a number of circumstances such as the fact that Sulman & Picard, shortly after entering into the contract with Wolf, acquired an interest in the Cattermole process, which fact they did not disclose to him until some time later; the fact that Chapman, their employee who conducted experiments on the Wolf process, was put to work on the Cattermole process after the Wolf experiments were concluded; the fact that the Eyre street plant, the construction of which was supervised by Sulman & Picard, proved a failure; and the fact that Sulman & Picard secured patents on processes involving air bubble flotation in the summer of 1903. All of these facts, with the other circumstances of the case, were carefully weighed and considered by the learned District Judge, as shown by his well-reasoned opinion, at the conclusion of which he states: "Careful consideration of the evidence requires the finding that * * * the charge of fraud on the part of the defendant, and the claim of equitable ownership of Wolf and the plaintiff of the patent of the defendant, is without foundation."

[1–3] As this is an appeal in equity, we are not bound by the trial judge's findings of fact, as we would be upon a writ of error; but the rule is well settled that, as he has seen and heard the witnesses, his findings ought not to be disturbed unless it clearly appears that he has misapprehended the evidence or has gone against the clear weight thereof, or, in other words, unless we are satisfied that his findings were clearly wrong. U. S. v. U. S. Shoe Machinery Co., 247 U. S. 32, 41, 38 S. Ct. 473, 62 L. Ed. 968; Adamson v. Gilliland, 242 U. S. 350, 37 S. Ct. 169, 61 L. Ed. 356; D. T. McKeithan Lumber Co. v. Fidelity Trust Co. (C. C. A. 4th) 223 F. 773; American Rotary Valve Co. v. Moorehead (C. C. A. 7th) 226 F. 202; Babcock v. De Mott (C. C. A. 8th) 160 F. 882. We have carefully considered the evidence in the light of the briefs and arguments, and we find nothing which would warrant us in reversing the finding of the District Judge. On the contrary, we are of opinion that his finding was right. There are a number of circumstances, it is true, which give color to the suspicions entertained by Wolf; but, when these circumstances are viewed in the light of the explanatory testimony, there is no evidence which would warrant the finding that

these metallurgists of high character and standing, as Sulman & Picard are shown to be, betrayed the confidence reposed in them by a client, and appropriated to their own use ideas which belonged to him.

The fact that Wolf disclosed to Sulman & Picard a process involving violent agitation and a reduction of the quantity of oil, and that violent agitation is employed in the froth flotation process with the oil reduced almost to the vanishing point, might seem at first glance to justify an inference that the idea back of that process was derived by Sulman & Picard from Wolf; but further consideration will disclose the essential difference between the two processes, and is convincing that consideration of or experimentation with the one would not necessarily or probably have led to discovery of the other. Wolf's process was a bulk oil flotation process; that of defendant was a froth flotation process. Wolf's patent utilizes the lifting power of oil due to its having a lower specific gravity than water. Defendant's patent utilizes the buoyancy of air; the oil used being practically lost in the process. Wolf used violent agitation to bring the particles of oil into contact with the metal particles, so that it might lift them to the surface; defendant's patent uses violent agitation to beat air into the mixture, so that a froth of bubbles will be produced. In Minerals Separation, Limited v. Hyde, supra, 242 U. S. 261, 268, 37 S. Ct. 82, 85 (61 L. Ed. 286), the Supreme Court, in distinguishing the froth flotation process from various oil buoyancy processes, relied upon as anticipations (the Wolf patent was introduced in evidence in that case, though not mentioned in the opinion) said:

"It is not necessary for us to go into a detailed examination of the process in suit to distinguish it from the processes of the patents relied on as anticipations, convinced as we are that the small amount of oil used makes it clear that the lifting force which separates the metallic particles of the pulp from the other substances of it is not to be found principally in the buoyancy of the oil used, as was the case in prior processes, but that this force is to be found, chiefly, in the buoyancy of the air bubbles introduced into the mixture by an agitation greater than and different from that which had been resorted to before and that this advance on the prior art and the resulting froth concentrate so different from the product of other processes make of it a patentable discovery as new and original as it has proved useful and economical. * * * The record shows not only

that the process in suit was promptly considered by the patentees as an original and important discovery, but that it was immediately generally accepted as so great an advance over any process known before that, without puffing or other business exploitation, it promptly came into extensive use for the concentration of ores in most, if not all, of the principal mining countries of the world, notably in the United States, Australia, Sweden, Chile, and Cuba, and that, because of its economy and simplicity, it has largely replaced all earlier processes. This, of itself, is persuasive evidence of that invention which it is the purpose of the patent laws to reward and protect."

As bearing on the contention that the process of defendant's patent is similar to that disclosed to Sulman & Picard by Wolf because it involves reduction in the quantity of oil, it is worthy of note that in the Hyde Case the Supreme Court held that defendant's patent did not protect generally a process of violent agitation with the use of a small quantity of oil, but only a process in which the oil was used in the "critical proportions" necessary to produce the froth flotation; that is, in quantities "amounting to a fraction of 1 per cent. on the ore."

Not only is there such essential difference between the process which Wolf had in mind and communicated to Sulman & Picard and the process covered by their patent as to negative any inference that the process of the patent was derived from Wolf, or discovered while experimenting on his process; but we have direct evidence from Sulman, Picard, and their employees that the froth flotation process was not thought of in connection with Wolf's process, and was not discovered while experimenting therewith, but was discovered about a year after all work for him had ceased, and while experiments were being conducted on an entirely different process in which the quantity of oil was reduced to a smaller amount than would have been feasible under the Wolf process. It is impossible to ignore this evidence, which stands unimpeached and uncontradicted.

With respect to the fact that Sulman & Picard acquired an interest in the Cattermole patent, the evidence shows that they disclosed to Wolf the fact that they were at work on an oil separation process when they accepted employment from him, that they did not acquire an interest in this process until afterwards, and that, when they entered into an agreement with him in February, 1904, with reference to supervising work on the large

scale plant, they again notified him of their work on the other process and of their opinion that it would prove superior to his. Mr. Justice Buckley found in the English suit, heretofore mentioned, that Wolf's diary showed that on September 15, 1903, Sulman told him that he was interested in the Cattermole process outside of his professional interest. But the fact that Sulman & Picard may have been remiss in not notifying Wolf more promptly of their interest in a patent which was not conceived of at the time as interfering in any way with the process which he was developing would not justify a conclusion that they appropriated his ideas and used them for the benefit of the other process, which, as we have seen, was essentially different; nor would it entitle him to claim discoveries made in connection with experiments on the other process, with which it is not shown that his process or ideas derived therefrom, had any connection whatever.

The fact that Chapman, the employee of Sulman & Picard, who performed the experiments on the Wolf process, was placed at work on the Cattermole experiments after finishing the Wolf experiments, is without sinister significance. Chapman's notebook has been introduced in evidence, containing full accounts of the experiments performed by him, and the entries show clearly that the experiments related to an oil bouyancy process. There is nothing to show that the froth flotation process was discovered or even thought of in connection with the experiments. The oil used was not reduced below 50 per cent. on the ore, and the evidence is that, even if it had been reduced to the proportions used in the froth flotation process, the types of oil used would not have produced the froth. That Chapman may have discovered the principle of the froth flotation process during these experiments is mere suspicion, and against this suspicion is the positive testimony of Chapman, corroborated by that of Sulman and Picard. Complainant makes much of the fact that one or more pages appear to have been cut from the notebook. This, of course, is a circumstance of suspicion, but Chapman, although he does not give a very satisfactory reason for the removal of the pages, swears positively that the book as presented contains all of the entries made in connection with the experiments, and the order in which the entries are made seems to corroborate his statement. At all events, we cannot infer that, because a leaf of the book is absent, it would, if present, show the discovery of the froth flotation process. La Bourgogne, 210 U. S. 95, 28 S. Ct. 664, 52 L. Ed. 973.

The failure of the Eyre street large scale plant appears to have been due to mechanical defects and to the fact that the oil employed was too heavy. There is no evidence to justify the conclusion that it failed through the contrivance of Sulman & Picard. Their report points out the causes of failure, and makes suggestions as to how defects might be overcome. If the theory of complainant be correct that they had at that time discovered the froth flotation process, they could have had no object in having the Scammell oil process to fail, as it would not have competed, as a practical matter, with the froth flotation process, and the two processes were so essentially different that the development of the Scammell oil process would never have given rise to a suspicion that the froth flotation process was discovered while experimenting upon it.

[4] The fact that Sulman & Picard, in the summer of 1903, secured patents on processes involving air bubble flotation, in the absence of explanation, would be a very suspicious circumstance. They explain it, however, on the basis of an accidental discovery made while watching the effect of air bubbles on a grape in a glass of champagne. The principle of bubble flotation was not a new discovery, being covered by a patent issued to one Froment, and it may well be, as both Sulman and Picard testify, that the patents issued to them in 1903 were not based upon information derived from or experiment conducted for any of their clients. The precise question as to whether Sulman & Picard "stole" from Wolf the idea of this bubble flotation patent was inquired into and directly passed upon adversely to Wolf in his suit with Sulman & Picard in 1905. While we do not regard the judgment in that case as an estoppel which precludes plaintiff from maintaining the suit at bar, as the issues in the two cases are entirely different and the issues here were not passed upon or determined there, we do regard it as settling the matters which were therein decided. And one of the matters so decided was that the bubble flotation patents were not obtained by Sulman & Picard as a result of their appropriation of the ideas of Wolf. As this is a suit virtually between the same parties, or their privies, the judgment of the English court is conclusive on that question. Southern Pac. R. Co. v. U. S., 183 U. S. 519, 532, 22 S. Ct.

154, 46 L. Ed. 307; Southern Pac. R. Co. v. U. S., 168 U. S. 1, at page 48, 18 S. Ct. 18, 42 L. Ed. 355.

[5] There is no question that the relationship existing between Wolf and Sulman & Picard was one of a confidential and fiduciary character. And it is equally well settled that, where such relationship exists, equity will exercise its jurisdiction to protect the person who is in a position of dependence from being imposed upon by those in whom he places reliance. Pomeroy on Equity Jurisprudence (4th Ed.) §§ 955 to 963. The rule is thus stated in Bispham's Principles of Equity (7th Ed.) 355:

"Wherever two persons stand in such a relation that, while it continues, confidence is necessarily reposed by one, and the influence which necessarily grows out of that confidence is possessed by the other, and this confidence is abused, or the influence is exerted to obtain an advantage at the expense of the confiding party, the person so availing himself of his position will not be permitted to retain the advantage, although the transaction could not have been impeached if no such confidential relation had existed"—citing Tate v. Williamson, L. R. 2 Ch. 61.

Complainant's trouble is not with the law, but with the facts. Unquestionably Sulman & Picard occupied a confidential relationship to Wolf. Unquestionably, if their froth flotation patent was obtained upon information communicated to them by him, or from experiments conducted for him, the obtaining of it was a fraud upon his rights and the patent belonged to him in equity, in justice, and in common honesty. But, before Wolf can claim the patent or ask that Sulman & Picard be convicted of fraud on his rights, he must establish that this patent, which was obtained after the employment of Sulman & Picard was ended, was based on information acquired from or experiments made for him while the relationship continued. This he has failed to do.

[6] What we have said in discussing the charge of fraud, in which we have pointed out the essential difference between Wolf's process and that of defendant's patent, practically disposes of the charge of infringement. Complainant, in fact, concedes that the process disclosed by defendant's patent is not an infringement of the Wolf patent, but contends that defendant is guilty of contributory infringement in that it has caused certain of its licensees to use methods of "overtreatment" and "retreatment" which infringe the Wolf patent. Without stopping to discuss whether the connection between defendant and its licensees is sufficiently shown to render it liable for the methods which they have adopted and which are alleged to constitute infringement, we are satisfied that the learned District Judge was correct in holding that these methods do not infringe. That which complainant describes as "overtreatment" in the Wolf patent is the requirement that the mixture of oil, water, and ground ore be agitated until the oil has taken up "all the metallic-mineral contents with some gangue." What complainant describes as "retreatment" is the requirement that the mineral bearing oil be passed through warm water so that the gangue shall be dropped out as the oil is thinned. Certain licensees of defendant, in applying the froth flotation process of defendant's patent, take the mineral bearing froth and repeat the process of the patent for the purpose of securing a purer metal concentrate. The fact that the froth in the first instance picks up some of the gangue as well as the metal particles is said to be an infringement of what is called the "overtreatment" of the Wolf process. The fact that the froth is put in water and reagitated without further addition of a frothing agent, with the result that there is a new froth formed with further separation of the metal particles from the gangue, is said to be an infringement of what is called the "retreatment" of the Wolf patent.

It is perfectly clear, however, that the processes pursued by the licensees of defendant are entirely different from the processes of the Wolf patent. As heretofore stated, that process covers an oil buoyancy process. Agitation of a violent character is resorted to in order that the particles of oil may be brought in contact with the particles of metal, and especially with those included in the slimes, so that, when the oil floats to the surface, it will bear these metal particles with it. The fact that the oil takes up some of the gangue is not a desirable element of the process, but is incidental to the violent agitation necessary to bring the particles of oil in contact with the metal. The essential difference between this process and the froth flotation process of defendant's patent has already been adverted to. The fact that some gangue is taken up by the froth of the froth flotation process does not constitute it an infringement of an oil buoyancy process in which gangue is also taken up; and calling the violent agitation, which causes the gangue to be taken up, "overtreatment," does not change the matter.

As to infringement in "retreatment," it must be apparent that the reagitation of mineral bearing froth is essentially different from passing thin streams of mineral bearing oil through hot water, so that the oil will be thinned and the gangue dropped therefrom. In the one case, we have a mere repetition of the process of defendant's patent, which admittedly does not infringe the Wolf patent; in the other case, we have a mere thinning of the mineral bearing oil by the application of heat, with the result that it drops the gaugue which it held while more viscous.

[7, 8] As we are of opinion that the decree of the District Court dismissing the bill should be affirmed upon the merits, it is unnecessary that we consider the special defenses pleaded in the answer. It may not be amiss to observe, however, that the laches shown by the record would be quite sufficient of itself to bar complainant of relief in this case. The patent of defendant was obtained in 1905. Wolf learned of it, according to his own statement, "in the latter part of 1911 or 1912," and yet this suit was not instituted until April 10, 1922, just eight days prior to the expiration of the Wolf patent. Wolf pleads poverty, but we are not convinced by the evidence that delay in instituting suit was due solely to this cause. He found means to institute other litigation in the meantime, and spent quite a good deal of time and money in efforts to exploit the patent and interest prospective purchasers. He seems to have had the enthusiastic backing of Sir Frank Crisp, who, in some of the correspondence introduced in evidence, claimed to have an interest in the patent; and certainly as to him no claim of poverty is made. Poverty is ordinarily no excuse for laches in instituting suit. Hayward v. National Bank, 96 U. S. 611, 618, 24 L. Ed. 855; Leggett v. Standard Oil Co. 149 U. S. 287, 294, 13 S. Ct. 902, 37 L. Ed. 737. And, if complainant is not barred by the laches here shown, it would be difficult to imagine a case which laches would bar.

"A court of equity," says Lord Camden, "which is never active in relief against conscience or public convenience, has always refused its aid to stale demands, where the party has slept upon his rights, and acquiesced for a great length of time. Nothing can call forth this court into activity but conscience, good faith, and reasonable diligence." Smith v. Clay, 3 Brown Ch. 638; Pomeroy's Equity Jurisprudence (4th Ed.) vol. 1, § 419; Hammond v. Hopkins, 143 U. S. 224, 12 S. Ct. 418, 36 L. Ed. 134; Gildersleeve v. New

Mexico Mining Co., 161 U. S. 573, 16 S. Ct. 663, 40 L. Ed. 812; Gill v. Colton (C. C. A. 4th) 12 F.(2d) 531; Naddo v. Bardon (C. C. A. 8th) 51 F. 493.

The case has been most ably presented, but, after giving careful consideration to the learned brief and brilliant oral argument of counsel for complainant, we find no error, and the decree of the District Court is affirmed.

Affirmed.